**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAYLOR CLINES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-CV-00153-NAB |
| | ) | |
| SPECIAL ADMINISTRATIVE BOARD | ) | |
| TRANSITIONAL SCHOOL DISTRICT OF | ) | |
| THE CITY OF ST. LOUIS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on two motions for summary judgment, one filed by

Defendants Special Administrative Board Transitional School District of the City of St. Louis

("SAB") and Thamous Wooten ("Wooten") (collectively "Defendants") (Doc. 118), and one filed

by Defendant Wooten (Doc. 120). The motions have been fully briefed and are ripe for disposition.

The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Court will grant in part and

deny in part Defendants' Motion for Summary Judgment and will grant Defendant Wooten's

Motion for Summary Judgment.

**I.      Facts**

Defendants filed a single Joint Statement of Uncontroverted Material Facts in support of

both motions for summary judgment. (Doc. 122.) Plaintiffs provided their own facts, to which

Defendants responded, and Plaintiffs also disputed certain facts in Defendants' Joint Statement[1],

---

[1] Pursuant to Local Rule 4.01(E), all facts set forth in Defendants' Joint Statement of Uncontroverted Material Facts
that were not addressed by Plaintiffs in their Response to Statement of Material Facts are deemed admitted for
purposes of summary judgment.

to which Defendants replied. (Docs. 129, 133, 135.) Unless otherwise indicated, the following facts are undisputed.[2] However, where facts are disputed, the Court draws all reasonable inferences in favor of Plaintiffs at this summary judgment stage.

### A. The Parties

At the time of the incident that is the subject of this lawsuit, Plaintiff Taylor Clines ("Taylor") was a 19-year-old student at Gateway Stem High School ("Gateway STEM") in the special education program. Taylor has been diagnosed with autism and is almost completely nonverbal. He communicates through an interpreter. Plaintiffs Diane and Damon Clines are Taylor's parents and legal guardians.

Defendant SAB is a government entity organized under the laws of Missouri. At the time of the incident, SAB governed the St. Louis Public Schools district ("District"), including Gateway Stem.[3] Defendant Thamous Wooten is an Instructional Care Aide employed by the District, where he has worked with special needs students in Gateway's Autism Program since August 2007. Plaintiffs allege that on February 4, 2013 Wooten grabbed Taylor by the foot and threw his foot upwards, causing Taylor to fall to the ground and sustain injuries.

### B. Taylor's Education and SAB's Policies

Taylor had an Individualized Education Plan[4] ("IEP") in place concerning special education and related services. In November of 2000, six-year-old Taylor's first IEP was implemented when he was determined to be eligible for special education and related services by

---

[2] The Court notes that the facts set out in this section do not include all of the parties' 168 factual assertions, responses, and replies. The facts set forth herein are intended to put the parties' claims and disputes in context.

[3] As of July 1, 2019, the SAB was no longer charged with governance and oversight of the District. On July 1, 2019, by operation of statute and action of the Missouri State Board of Education, the right to govern the District was transferred to the elected Board of Education. The Board currently holds all the powers formerly vested in the SAB, and chooses to defend this suit on behalf of the District. (Doc. 122 at 2, n.4.)

[4] An IEP consists of a detailed written statement arrived at by a multi-disciplinary team specifying the services, including specially designed instruction, that a child will receive." *Aumann v. Wentzville R-IV School Dist.*, No. 4:13-CV-867 CEJ, 2014 WL 1648742 at *2 (E.D. Mo. Apr. 23, 2014).

the District. Taylor's IEP was reviewed and modified at least once a year by his IEP team to continually develop his plan to account for Taylor's educational, communication, and behavioral needs. Taylor's IEP team included his parents and various school representatives, including the Autism Department Head and the school's occupational therapist.

Prior to the alleged incident, Taylor's IEP was most recently updated on October 23, 2012. Consistent with prior years attending school in the District, Taylor was assigned a para-educator to assist with supervision throughout the day to ensure the safety of himself and others. Pursuant to Taylor's IEP, "Taylor requires the full time support of a para-educator to meet his academic, functional, and pre-vocational needs. At times, Taylor will attempt to leave his assigned area when he becomes upset, with the tendency to escalate into tantruming that involves grabbing and throwing items within reach, attempting to hit and/or kick objects and people within reach with the possibility of injuring himself and/or others."

Taylor was assigned a regular para-educator, referred to by Gateway STEM as an Instructional Care Aide ("ICA"). The SAB had no policy in place regarding assignment of substitute ICAs; however, when a student's ICA was absent, the Autism Department Head, Christine Lato, would assign a trained ICA who had worked with that student previously.

MANDT is the District's policy for autism classrooms. MANDT training teaches, among other things, skills to address physical interactions between faculty and students and how to keep individuals safe. The District's MANDT instructor provided annual training for ICAs, including Wooten. Jason Dulick, the MANDT instructor, testified that he could not recall if his training addressed what to do if a student has kicked someone. Wooten testified pursuant to MANDT, when someone kicks at you, you should step back. Wooten also testified that MANDT did not address how to react when a student comes off balance. According to Defendants' expert, Dr.

3

Otten, MANDT training includes the use of a slide step or stepping backwards when kicked. Both MANDT and SAB's policy regarding behavioral intervention do not allow for hyperextension of any body part, or to put a student off balance.

### C.  Prior Incident

On October 2, 2012, before the incident giving rise to Plaintiffs' claims, Taylor was hit and pushed by another ICA, Gerald Harris. Taylor communicated to his interpreter that Mr. Harris hit him in the face. Taylor's family was contacted, and he was picked up from school early. Mr. Harris and others who witnessed the event stated Mr. Harris did not hit Taylor. Mr. Harris said he was defending himself because Taylor was hitting and kicking him. Mr. Harris had marks on his arms from being hit or kicked. Portions of the incident were captured on surveillance video. The video showed Mr. Harris shoved Taylor, and Taylor subsequently kicked at Mr. Harris.

After the incident, Principal Elizabeth Bender called Taylor's parents, who noted that Taylor's face was red. Principal Bender also called Missouri Division of Family Services ("DFS") to report the employee-student incident, and the Missouri Department of Health and Senior Services ("MDHSS") conducted an investigation. SAB suspended Mr. Harris until completion of the investigation. SAB ultimately determined that "Mr. Harris acted inappropriately and unprofessionally by shoving a student, in violation of SAB Policy 4840 – Code of Conduct." SAB did not inform Taylor's parents there was a video of the incident or provide them with any investigative materials. MDHSS found that Taylor's allegations were to be believed, the school handled the situation, and no further intervention was required.

### D.  The Incident at Issue

The incident giving rise to Plaintiffs' claims occurred on February 4, 2013. Three adults were present for the incident between Wooten and Taylor: Erin Simeone, an Occupational

Therapist, Christine Lato, the Autism Department Head, and Michaela Floore, a security officer on duty at the security desk that day. When Taylor and his mother arrived at school, they learned that Taylor's regular ICA and regular interpreter were absent or unavailable. Ms. Lato assigned Wooten to be Taylor's substitute ICA. This was the first time Wooten was assigned to Taylor. Wooten was not told the regular interpreter was out that day, and he was given no direction from Ms. Lato. Prior to February 4, 2013, Wooten did not have a one-on-one relationship with Taylor, but had observed Taylor in hallways and learned about Taylor's challenges and behaviors, including his tendency to kick, when Taylor was discussed at monthly staff meetings.

At approximately 8:00 a.m., shortly after Taylor arrived at school, he went into Ms. Simeone's office, visibly upset. Taylor stormed out of the room kicking at Mr. Wooten twice while Wooten stood at Ms. Simeone's doorway. Wooten was able to step out of the way to avoid the two kicking attempts. Ms. Simeone asked Wooten to stay with the other student in Ms. Simeone's office so that she could follow Taylor out of the room and into the hallway. When Ms. Simeone and Taylor returned, Taylor was still upset. Wooten went to the other end of the hallway to get Ms. Lato to help calm down Taylor. As Ms. Lato approached, she asked Wooten where Taylor was. Wooten testified that as he turned to point towards Ms. Simeone's office, he observed Taylor in his peripheral vision running up to him to kick.

At this point, the witnesses described the event somewhat differently. Wooten testified that he was unable to back up away from Taylor like he had done with the prior kicks because Wooten was against a wall at that point, and Taylor approached him quickly from behind. He testified that Taylor's kick was waist-high, towards Wooten's abdomen or groin area, and Wooten crouched to protect himself and blocked the kick with his arm. Wooten then noticed Taylor beginning to lose his balance. Wooten instinctively grabbed Taylor's pants leg to try to break Taylor's fall. Wooten

5

testified that during the encounter, he followed MANDT procedure by trying to break Taylor's fall after he blocked the kick, but that in grabbing Taylor's pants leg when Taylor lost balance, he "did not get a chance to use the MANDT training because it was an instinctive move. He's kicking at me, and I'm defending myself." It is undisputed that Taylor did fall, injuring his right arm and elbow. Ms. Simeone was standing nearby and was able to catch Taylor's head during the fall. Ms. Lato, having witnessed the encounter, immediately called the nurse.

On the day of the incident, Wooten, Ms. Simeone, and Ms. Lato each drafted witness statements. Security Officer Michaela Floore's written statement was also taken. As described above, Wooten stated he blocked Taylor's kick. He showed his statement to Ms. Lato, and she disagreed with his assessment, as she saw Wooten "grab" Taylor's foot and "push" it upwards. Ms. Lato's written statement from that day states, in part:

> Today at about 8:00 a.m. I heard Taylor Clines yelling in the hallway. As I went to intervene, I witnessed Taylor attempting to kick Mr. Wooten. Instead of using his MANDT stance, which he is trained to use, he grabbed Taylor's ankle and pushed his leg upward causing Taylor to fall to the ground on his arm, which caused him to break his arm.
> ***
> I received Mr. Wooten's statement. He asked me to read it. I did and told him that it was inaccurate. He stated he blocked Taylor's foot with his hand. I told him that myself and 2 other witnesses all saw him GRAB his foot and RAISE it which caused him to fall.
> I went immediately to Officer Florees and told her that he denied it. She said she saw it and would write it in her statement.

(Doc. 129-13.) At her deposition, Ms. Lato testified that Mr. Wooten was not employing MANDT, but she believed Mr. Wooten's conduct was an instinctive reaction to the kick, and not a means of intentionally injuring Taylor. Ms. Lato testified that Mr. Wooten did not appear angry or upset during the encounter, but afterwards he seemed upset that Taylor was injured and he expressed concern for Taylor's well-being.

6

Ms. Simeone testified that she observed Taylor kicking at Wooten with a side kick that reached the height of Wooten's mid-section. While Taylor was kicking, Wooten was watching Ms. Lato and waiting for her as she came down the hallway. He was calm and not yelling or frantic, and she did not observe him respond forcefully or aggressively towards Taylor. She believes he was "leaning back towards the wall in a very calm stance waiting for Ms. Lato." Ms. Simeone's written statement from that day states Wooten "caught" Taylor's leg, which caused Taylor to lose his balance and fall backwards. She testified that Wooten was against a wall and Taylor approached him in a "fast" and "aggressive" manner. Wooten did not "grab" Taylor's foot, because in her mind "grab is more intentional, and what I saw was not an intentional act. It was more of a reflex at what was coming at him." She testified that "Mr. Wooten didn't take [Taylor] off balance. The contact that was made caused Taylor to lose his balance and fall, but Taylor initiated that contact."

Officer Michaela Floore's statement reflects that while she was on duty at the security desk, she saw Taylor leave a classroom very upset and he started hitting lockers. Taylor then went inside the office still upset doing hand signing. Taylor then "walked towards Mr. Wooten attempting to kick him, Mr. Wooten then grabbed Taylor['s] left leg, while holding Taylor['s] left leg he fell to the floor" causing injury to his right arm.

### E.  The Aftermath

As a result of the incident, Taylor fractured his wrist and right distal humerus and dislocated his elbow. Taylor's injuries required surgical hardware placement, which places him at a low risk of future surgery.

Damon Clines testified that when he picked Taylor up from school on the day of the incident, Ms. Lato came to his vehicle and told him that Taylor had been assaulted. He further

testified that Ms. Lato said he should get a lawyer and request a copy of her written statement, and that if anyone ever found out she told him, she could lose her job.

Principal Bender reviewed the video footage of the hallway where the incident occurred. She testified that the incident was not captured on the video. She testified that if any kind of contact had been seen on the video, it would have been preserved, but because "nothing even slightly alarming" was captured, the video was not preserved.

The Missouri Department of Health and Senior Services investigated the incident. Wooten did not appear for his scheduled interview with the MDHSS investigator. Wooten testified he never received the notice of his interview, and that no one from the Department called to have him appear. According to the MDHSS investigation summary, Gateway Stem School was unable to provide requesting information after consulting with their legal team. MDHSS determined the injuries that Taylor suffered caused the allegations to be valid, but they were unable to establish the facts necessary to determine the validity of the allegations.

Taylor continued to attend Gateway after the injury to his arm but due to his continuing behaviors, Taylor's IEP team, including his parents, determined enrollment at Emerson Academy would be his appropriate placement. Taylor enrolled at Emerson Academy beginning on February 4, 2014, and remained there until his high school graduation from SAB on March 5, 2015.

### F.  Procedural History

Taylor and his guardians Diane and Damon Clines (collectively "Plaintiffs") brought this action against Defendants by filing a three-count Complaint on January 31, 2018. (Doc. 1.) On June 20, 2018, Plaintiffs filed a First Amended Complaint ("FAC"). (Doc. 20.) Plaintiffs' FAC clarified the proper Defendant entity. On June 25, 2018, Defendants SAB and Wooten filed their respective answers to Plaintiffs' FAC. On February 26, 2019, Defendants sought leave to add the

affirmative defense of failure to exhaust administrative remedies under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.* (Doc. 44.) The Court granted Defendants' motion for leave to file the additional affirmative defense. (Doc. 55.) On June 14, 2019, Plaintiffs moved for leave to file a Second Amended Complaint ("SAC"), stating the purpose of the amendments was to reflect evidence revealed during discovery and not to create any new causes of action. (Doc. 80.) The Court granted the motion. (Doc. 92.)

Plaintiffs' Second Amended Complaint alleges three counts. Count I is categorized as "Substantive Due Process-Bodily Integrity" against Defendant SAB for violation of Plaintiff Taylor Clines' substantive due process right under 42 U.S.C. § 1983 through its (i) custom, policy, and procedures that were put in place by Defendant SAB that led to the violation, (ii) Defendant SAB's failure to properly train and supervise its employees, and (iii) Defendant SAB's creation of the danger to Plaintiff Taylor Clines. Count II is categorized as "Substantive Due Process-Bodily Integrity" against Defendant Wooten for violation of Taylor's substantive due process rights under 42 U.S.C. § 1983. Count III is a state law tort claim for recklessness against Defendant Wooten. Plaintiffs seek an award of compensatory and punitive damages, attorney's fees and costs.

## II.   Standard of Review

The standard for summary judgment is well settled. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary

materials that set out specific facts showing that there is a genuine issue for trial. Id. at 324. "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The nonmoving party bears the burden of "presenting evidence sufficiently supporting disputed material facts that a reasonable jury could return a verdict in their favor." *See Gregory v. City of Rogers, Ark.,* 974 F.2d 1006, 1010 (8th Cir. 1992). To establish the existence of a genuine issue of material fact, "[a] plaintiff may not merely point to unsupported self-serving allegations." *Bass v. SBC Commc'ns, Inc.,* 418 F.3d 870, 872 (8th Cir. 2005). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). "The mere scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (emphasis added); *Davidson & Assoc. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005); *Smith v. International Paper Co.* 523 F.3d 845, 848 (8th Cir. 2008) (the nonmoving party must "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy"). Evidence that is "merely colorable" or "is not significantly probative" is insufficient. *Anderson*, 477 U.S. at 249-50; *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011).

## III.   Discussion

### A.  Exhaustion of Remedies Under the IDEA

Defendants argue that Plaintiffs were required to exhaust their administrative remedies under the Individuals with Disabilities Education Act ("IDEA") prior to filing this lawsuit, and

summary judgment must be granted because of said failure to exhaust. It is undisputed that Plaintiffs did not exhaust administrative remedies prior to filing this case. However, Plaintiffs contend the IDEA exhaustion requirement is not applicable in this case because Plaintiffs' claims are not related to the denial of a free appropriate public education.

The IDEA is a federal statute that "established procedural safeguards to ensure individuals with disabilities will have the opportunity to obtain a free appropriate public education." *J.B. ex rel. Bailey v. Avilla R-XIII Sch. Dist.*, 721 F.3d 588, 592 (8th Cir. 2013) (citing 20 U.S.C. § 1415(a)). "The primary tool for implementing the aims of the IDEA is the IEP, which tailors the statutorily required free appropriate public education to each child's unique needs." *Id.* (citing *Honig v. Doe*, 484 U.S. 305, 311 (1987)). "The other safeguards include an opportunity to present complaints concerning any aspect of the local agency's provision of a free appropriate public education; and an opportunity for an impartial due process hearing with respect to any such complaints." *Id.* (citing *Honig* at 310-11). "A party aggrieved by the outcome of an IDEA due process hearing may challenge the outcome before the state educational review agency." *Id.* "The outcome of the review hearing may then be disputed in district court." *Id.* (citing 20 U.S.C. § 1415(i)(2)(A)). "However, before parties may bring a claim in district court under a different statute for which they seek relief which is also available under the IDEA, the parties must first exhaust the administrative remedies under the IDEA." *Id.* (citing 20 U.S.C. § 1415(l)). "The IDEA exhaustion requirement applies to claims brought under section 504 or other federal statutes only to the extent those claims seek relief that is also available under the IDEA." *M.Y. ex rel J.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 888 (8th Cir. 2008).

In *Fry v. Napolean Community Schools,* the Supreme Court "consider[ed] the scope of that exhaustion requirement," and held "that exhaustion is not necessary when the gravamen of the

plaintiff's suit is something other than the denial of the IDEA's core guarantee—what the Act calls a 'free appropriate public education [FAPE].' § 1412(a)(1)(A)." 137 S. Ct. 743, 748 (2017).

In "determining whether a suit indeed 'seeks' relief for [denial of a FAPE], a court should look to the substance, or gravamen, of the plaintiff's complaint." *Id.* at 752. "The use (or non-use) of particular labels and terms is not what matters." *Id.* at 755. The inquiry "does not ride on whether a complaint includes (or, alternatively, omits) the precise words 'FAPE' or 'IEP.'" *Id.* Rather, exhaustion is required "when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way." *Id.* at 755. Any other approach "would allow plaintiffs to evade the Act's restrictions through artful pleading." *Id.* That said, if "the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required." *Id.* at 754. "A further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings.

Here, Defendants argue that "the history of the proceedings—most notably, the allegations set forth in the Complaint and First Amended Complaint—demonstrate that Plaintiff's IEP and the FAPE it was supposed to provide is the central dispute" in this case. Defendants explicitly incorporate by reference Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (Docs. 98-99) to their argument,[5] and they again emphasize that Plaintiffs used their Second Amended Complaint to remove repeated references to Plaintiffs' IEP from the prior complaints. Plaintiffs also argue application of the hypothetical questions posed by the Supreme Court in *Fry* demonstrate that Plaintiffs seek relief for the denial of a FAPE. The Court has already analyzed Plaintiffs' allegations and the *Fry* hypotheticals and found that based on the Second Amended

---

[5] Additionally, a comparison of the arguments regarding Plaintiffs' failure to exhaust administrative remedies in Defendants' Memorandum in Support of their Motion to Dismiss (Doc. 99) and Defendants' Memorandum in Support of their Motion for Summary Judgment (Doc. 119) reveals that Defendants' summary judgment arguments on this score are similar, and in some respects identical, to their arguments in their Motion to Dismiss.

Complaint and its prior iterations, the gravamen of the claims is not a denial of FAPE. (Doc. 141.) The Court will not revisit that discussion here.

Defendants' only new argument offered in its summary judgment motion on this point is that the evidence set out in the parties' facts establish that the foundation of Plaintiffs' liability theories is that Taylor was provided an ineffective ICA who failed to implement the terms of the IEP. (Doc. 119 at 18.) The Court disagrees. The record before the Court regarding the details of Taylor's IEP and Wooten's training and duties as an ICA in the District do not change Plaintiffs' claims against Defendants. As the Court explained in its order on Defendants' motion to dismiss, Plaintiffs' claims arise from Wooten's conduct, not violations of the IEP. *See, e.g., K.G. by & through Gosch v. Sergeant Bluff-Luton Cmty. Sch. Dist.,* 244 F. Supp. 3d 904, 921 (N.D. Iowa 2017) (where student with autism was dragged across the floor by his teacher, "violation of the IEP and BIP [were] not the central allegations of wrongfulness of the conduct in any of the six claims for relief" against the student's teacher, principal, and school district); *Moore v. Kansas City Pub. Sch.*, 828 F.3d 687, 692 (8th Cir. 2016) (Plaintiff's references to the flaws in special needs student's IEP "do not convince us that the propriety of D.S.'s disability and education raises issues concerning the 'educational placement' of D.S., thereby implicating the IDEA.").

Here, the evidence presented does not change the Court's analysis. The facts reflect that Wooten either caught or grabbed Taylor's leg during their interaction, and that contact resulted in Taylor's fall. Plaintiffs' claims arise from this interaction, which ultimately resulted in Taylor's injuries. Defendants emphasize that Plaintiffs' argument on the merits of the claims references Taylor's status as a special needs student, the SAB's lack of policy regarding substitute ICAs, and the SAB's lack of additional or more specific training for an ICA assigned to Taylor, given his known tendency to kick. However, these arguments and facts do not indicate that Taylor's

education has been affected due to the injuries he suffered from the fall. Even Plaintiffs' claims based on the SAB's customs, policies, or procedures, failure to properly train and supervise its employees, and creation of danger to Taylor allege that SAB's violations or failures led "to the assignment of an untrained ICA assaulting an autistic student who's [sic] routine had been severely upset." (Doc. 127 at 12.) Such a claim is unrelated to or beyond the scope of a FAPE. *See, e.g., K.G.,* 244 F. Supp. 3d at 922 ("[I]n the § 1983 claim, the allegation of the wrongfulness of [Principal] Adams's conduct is not that it violated KG's IEP or BIP, but that it involved 'deliberate indifference to the risk of harm to KG' from inadequate training and supervision of faculty and staff 'in the use of force and restraint when seizing special education students with disabilities.'"); *N.P. by Perillo v. Sch. Bd. of Okaloosa Cty., Fla.*, 2019 WL 4774037, at *14 (N.D. Fla. Sept. 30, 2019) (*citing Fry,* 137 S. Ct. at 756 n.9) (student's discrimination claims against the school board were not subject to exhaustion because "[t]he Supreme Court has specifically noted that a claim involving physical abuse of a disabled student by a teacher, acting out of animus or frustration, 'is unlikely to involve the adequacy of special education—and thus is unlikely to require exhaustion"); *Barr v. Sedgwick Cty. Area Educ. Servs. Interlocal Coop. #618*, 2020 WL 5572692, at *3 (D. Kan. Sept. 17, 2020) (finding no requirement of exhaustion when teacher struck autistic student in the face and physically restrained him, despite allegations that the student's education was affected due to the harms by his extreme aversion to attending school). Because Plaintiffs' claims do not seek relief for a denial of FAPE, Plaintiffs were not required to exhaust administrative remedies prior to filing suit. Defendants' motion on this point is denied.

### B.  Section 1983 Claim against Wooten

Plaintiffs bring Count II against Wooten in his individual capacity, alleging violations of substantive due process. The Due Process Clause protects individuals against arbitrary exercises

of government power. *County of Sacramento v. Lewis,* 523 U.S. 833, 845-46 (1998). To be arbitrary in the constitutional sense, an executive abuse of power must "shock[] the conscience." *Id.* The Due Process Clause does not "impos[e] liability whenever someone cloaked with state authority causes harm." *Id.* at 848. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849. "[M]erely negligent acts cannot, as a constitutional matter, [shock the conscience]: To hold otherwise 'would trivialize the centuries-old principle of due process of law.'" *S.S. v. McMullen*, 225 F.3d 960, 964 (8th Cir. 2000) (quoting *Daniels v. Williams,* 474 U.S. 327, 332 (1986)).

"The Eighth Circuit's threshold on this matter in relation to student discipline is extremely high." *Plaintiff, his parent, o/b/o J.M., Minor v. Hopkins Sch. Dist., Indep. Sch. Dist. No. 270*, No. CIV.01-2124 MJD/SRN, 2003 WL 41639, at *6 (D. Minn. Jan. 3, 2003). To find a substantive due process violation,

> [t]he government action must be truly irrational and consist of conduct that is more than merely arbitrary, capricious, or violative of state law. Substantive due process is concerned with violations of personal rights ... so severe ... so disproportionate to the need presented, and ... so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power literally shocking to the conscience.

*Golden v. Anders,* 324 F.3d 650, 652-53 (8th Cir. 2003) (internal quotations omitted).

There are few cases within the Eighth Circuit analyzing whether an educator's interaction with a student gives rise to a substantive due process violation. Defendants cite to cases where a school employee's conduct in response to student misbehavior did not shock the conscience. *See, e.g., Golden v. Anders,* 324 F.3d 650, 652-53 (8th Cir. 2003) (principal threw plaintiff on a bench and held him down by his neck and collar after he violently kicked a vending machine); *Daniels*

15

*v. Lutz*, 407 F. Supp. 2d 1038, 1041 (E.D. Ark. 2005) (teacher hit student in side of head with a manila folder and a book after warning students to take their seats, and grabbed student by shirt collar and put her hands on his neck to prevent him from leaving classroom). In one instance, a coach dragged a student across the floor and banged his head into a metal pole, the Eighth Circuit affirmed the district court's conclusion that the coach's actions were not shocking to the conscience. *London v. Directors of DeWitt Pub. Sch.*, 194 F.3d 873, 877 (8th Cir. 1999) ("This is not the kind of truly egregious and extraordinary case for which the theory of substantive due process is properly reserved.").

When it comes to applying the "shock the conscience" standard in the context of special needs students, there are even fewer cases within the Circuit. In one case, when a teacher repeatedly called a special education student retarded, stupid, and dumb, and on one occasion belittled her in front of the class for a poor grade and threw a notebook at her, hitting her in the face, the Eighth Circuit stated that "[a]lthough Kercher's behavior, as alleged by the plaintiffs, strikes us as being singularly unprofessional, we conclude that the plaintiffs have not raised a genuine issue of material fact on whether his behavior was sufficiently shocking to the conscience to state a substantive due process claim." *Costello v. Mitchell Pub. Sch. Dist. 79,* 266 F.3d 916, 921 (8th Cir. 2001).

The undersigned finds *K.G. by & through Gosch v. Sergeant Bluff-Luton Cmty. Sch. Dist.* to be particularly illustrative. 244 F. Supp. 3d 904, 909 (N.D. Iowa 2017). In *K.G.,* a special education teacher dragged a seven-year-old autistic student across a classroom floor by his legs, causing him serious carpet burns. K.G. was flailing, whining, and kicking on the floor, behaviors which were identified in his education plans. *Id.* at 910-11. His teacher tried approved techniques to de-escalate the situation, but K.G. continued flailing his arms and kicking, gradually moving

16

across the classroom floor. *Id.* K.G.'s teacher testified that she became concerned that he was moving closer to her heavy desk and grabbed his legs to move him to a more open area. *Id.* at 911. She stopped dragging him once he indicated he was in pain. *Id.* K.G.'s parents alleged the teacher violated K.G.'s substantive due process rights, among other rights. The plaintiffs also argued that although the teacher had special training and certification to teach special education, she did not have the necessary training because the principal, who was also a defendant, failed to ensure the teacher had MANDT training until *after* the incident. *Id.* at 910, 926. The plaintiffs also point to three prior instances where a paraprofessional, a school resource officer, and the principal, respectively, had grabbed, dragged, or held down K.G., but the defendants disputed the facts concerning the prior incidents. *Id.* at 910.

There, the defendants argued there was nothing "shocking" or "irrational" about the teacher's response to K.G.'s conduct, because she made a "split second decision to move him out of harm's way" when she reasonably believed he could hurt himself or others, and she stopped immediately when he complained of pain. *Id.* at 923. The plaintiffs responded that there were disputed issues because there was no need to make a split second decision, and the teacher's conduct was unreasonable and unacceptable, as the defendant's own expert opined that nothing in MANDT training would allow a teacher to drag a student across a carpeted floor, and both parties' experts agreed it was improper to drag a child as a form of discipline or control. *Id.* at 924.

The district court found that there was evidence to suggest that the teacher's conduct was "a substantial departure from professional judgment, practice, or standards." *Id.* at 926. The court also found that evidence that the incident continued with little escalation for ten minutes undermined any argument that the teacher's conduct was based on a "split second decision" to move K.G. to prevent harm to himself or others. *Id.* at 927. The court found that the teacher's

conduct was "intentional," but not malicious. The court rejected plaintiffs' arguments of a "pattern" of conduct indicating malice based on evidence that the teacher was not the first person at the school to use force on K.G., and found that the teacher's use of de-escalation techniques and that she stopped dragging K.G. once she saw it caused him pain further negated any inference of malice. *Id.*

Defendants rely on *Golden* and *Daniels* to argue that Wooten's conduct in response to Taylor's kicking did not shock the conscience. Taylor was upset, and efforts to comfort him were unsuccessful. They assert that Wooten was unable to avoid contact with Taylor because his back was against the wall when Taylor approached him to attempt to kick him for a third time. They argue that Wooten acted in self-defense and to maintain order, and there was no evidence to presume he acted sadistically or maliciously such that this was constitutionally arbitrary conduct.

Plaintiffs have not cited any cases that aid their contention that Wooten violated Taylor's substantive due process rights. Plaintiffs argue that Ms. Lato's written statement creates a dispute as to whether Wooten was acting in self-defense, and that Wooten knew how to avoid the first two kick attempts consistent with MANDT procedure. Plaintiffs argue that this evidence, combined with Wooten's disregard for his training and school policy, could allow a reasonable jury to conclude that Wooten acted out of frustration and with malicious intent.

The Court has carefully reviewed the eyewitness accounts of the incident. It is undisputed that Wooten's conduct was in response to Taylor's attempts to kick him. Ms. Simeone and Wooten both testified that Wooten caught Taylor's leg in an instinctive manner, as a reflex to the kicking and/or to break Taylor's fall. While Ms. Lato's statement reflected that Wooten "grabbed" Taylor's foot or ankle and "pushed" his leg upward causing the fall, she believed this was an instinctive reaction, not an intentional attack. There is no evidence to support that Wooten had any prior

animus towards Taylor or that Wooten was angry at Taylor during the encounter. According to Ms. Lato, Wooten only became upset when he saw Taylor was hurt. Notwithstanding Plaintiffs' arguments, the undersigned finds that there is no genuine issue of material fact that would lead a trier of fact to infer malice. Even assuming Wooten grabbed Taylor's leg and pushed it upwards for the purpose of knocking him off balance and not to prevent him from falling, this does not rise to the level of such a severe or disproportionate reaction to being kicked that "it amounted to brutal and inhumane abuse of official power literally shocking to the conscience." *See Golden,* 324 F.3d at 653. In fact, the cases that find no constitutional violation occurred have more offensive and shocking facts than Plaintiffs' unsupported theory that Wooten intentionally "threw" or "flipped" Taylor into the air out of frustration from Taylor's kicking. As a matter of law, Wooten's conduct cannot be said to shock the conscience. Defendants are entitled to summary judgment on Count II.

## 1. Qualified Immunity

In Wooten's separate motion for summary judgment, he alleges he is entitled to qualified immunity on Plaintiffs' § 1983 claim against him in his individual capacity. "Qualified immunity protects individual state actors from liability under § 1983 unless they violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 632 (8th Cir. 2010). Courts examine the applicability of the defense of qualified immunity in two parts, determining (1) whether the plaintiff has alleged facts that show a violation of a constitutional right, and, (2) whether that right was clearly established at the time of the alleged misconduct. *Brown v. City of Golden Valley,* 574 F.3d 491, 496 (8th Cir. 2009). If the plaintiff failed to establish a constitutional violation, no additional inquiry is necessary, and the official is entitled to qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan,* 555 U.S. 223 (2009) (holding that courts

may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first).

Wooten argues he is entitled to qualified immunity because his response to being kicked by Taylor was clearly within the scope of professionally acceptable choices and did not violate a clearly identified right secured by the Constitution. Plaintiffs argue that "maliciously throwing a student to the ground" is not within the scope of professionally acceptable choices. As explained above, even viewing Plaintiffs' submissions in the most favorable light, Plaintiffs' characterization of Wooten's conduct is not supported by the facts. Because Plaintiffs have not generated genuine issues of material fact that there was a constitutional violation, Wooten is also entitled to summary judgment on Plaintiffs' § 1983 claim against him on the basis of qualified immunity.

### C.  Section 1983 Claim against SAB

Defendants seek summary judgment on Count I of Plaintiffs' Second Amended Complaint alleging municipal liability under § 1983 against SAB under three theories of liability: (1) SAB's custom, policy or procedures led to the violation of Taylor's substantive due process rights; (2) SAB's failure to properly train and supervise its employees; and (3) SAB's creation of the danger to Taylor. Plaintiffs allege under its theories that SAB's conduct "directly led to the situation where Defendant Wooten threw Plaintiff Taylor Clines to the floor causing serious and permanent injury," and SAB used its authority to assign staff to create an opportunity in which "Defendant Wooten would react violently to known behaviors of Plaintiff Taylor Clines."

For § 1983 liability to attach to SAB under any of the three municipal liability theories, Plaintiffs must show an underlying constitutional violation by Wooten. *See, e.g., Neal v. St. Louis Cty. Bd. of Police Comm'rs*, 217 F.3d 955, 959 (8th Cir. 2000) ("Because Peterson did not violate Neal's Fourteenth Amendment rights, the County and City Official defendants cannot be held

liable for a failure to train or supervise Officer Peterson."); *Brodnicki v. City of Omaha,* 75 F.3d 1261, 1266 (8th Cir. 1996) (holding that a city cannot be held liable under an inadequate training or municipal custom theory unless the defendant police officer is found liable on the underlying substantive claim); *see also Domingo v. Kowalski,* 810 F.3d 403, 416 (6th Cir. 2016) ("Because we find that Kowalski's conduct did not rise to the conscience-shocking level required of a Fourteenth Amendment substantive due process claim, there is no basis for holding her supervisors or school district liable."). Accordingly, because Wooten is entitled to summary judgment on Plaintiff's § 1983 claim in Count II, SAB is also entitled to summary judgment on the § 1983 claims in Count I.

### D. Recklessness Claim against Wooten

Wooten makes three arguments as to why he is entitled to summary judgment on Count III, Plaintiffs' recklessness claim. First, Wooten asserts he is entitled to official immunity from tort liability because he is a public employee who is immune from claims arising from the performance of discretionary acts. Second, Wooten asserts he is entitled to absolute immunity based on the *Paul D. Coverdell Teacher Protection Act of 2001*.[6] Third, Wooten argues that even if his affirmative defenses do not apply, Plaintiffs have not identified disputed facts sufficient to demonstrate Wooten had the requisite state of mind to establish a cause of action for recklessness under Missouri law.

#### 1. Official Immunity

Missouri state law provides official immunity to public officials acting within the scope of their authority for injuries arising from their discretionary acts or omissions, but not for torts

---

[6] Wooten's Motion for Summary Judgment initially argued sovereign immunity was also applicable. However, Plaintiffs have clarified they have abandoned claims against Wooten in his official capacity, and as such, Wooten properly abandoned arguments related to sovereign immunity of claims against Wooten in his official capacity.

committed when acting in a ministerial capacity. *Hutson v. Walker*, 688 F.3d 477, 485 (8th Cir. 2012). For purposes of official immunity under Missouri law, "discretionary acts," require the exercise of reason in the adaption of means to an end, and discretion in determining how or whether an act should be done or a course pursued. *Id.* "Ministerial acts," in contrast, are of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed. *Id.*

Wooten argues that because his conduct was discretionary, official immunity applies. Plaintiffs do not dispute that Wooten's actions were discretionary in nature. Instead, Plaintiffs argue that Wooten's conduct is not protected by official immunity because Wooten acted with malice or bad faith. Wooten replies that there is no evidentiary support for Plaintiffs' conclusion that there is a reasonable inference of malice.

Under Missouri law, a discretionary act will not be protected by official immunity if it is "done with bad faith or with malice." *B.A.G. ex rel. Greer v. Morris*, No. 4:12CV01617 AGF, 2014 WL 4267481, at *2 (E.D. Mo. Aug. 28, 2014) (quoting *Davis v. Board of Education,* 963 S.W.2d 679, 688-89 (Mo. App. 1998)). A defendant acts with malice by acting with "actual intent to cause injury" or by "wantonly doing that which a person of reasonable intelligence would know to be contrary to his duty and which the defendant intends to be prejudicial or injurious to another." *Id.*; *Jiang v. Porter,* 156 F.Supp.3d 996, 1006 (E.D. Mo. 2015); *see also State ex rel. Twiehaus v. Adolf,* 706 S.W.2d 443, 447 (Mo. 1986) ("An act is malicious if it is done knowingly and deliberately, for an improper motive and without legal justification."). For purposes of official immunity, "[a] finding of bad faith embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through

22

some ulterior motive." *Ziegler v. City of St. Louis, Missouri*, No. 4:18-CV-01577-JAR, 2020 WL 709257, at *7 (E.D. Mo. Feb. 12, 2020).

Wooten relies on *State ex rel. Alsup v. Kanatzar* and *Golden ex rel. Balch v. Anders* to argue the applicability of official immunity and Wooten's lack of malice, respectively. In *Alsup,* the Supreme Court of Missouri extended official immunity to a teacher after his use of physical restraint on a student that resulted in the student's broken arm. 588 S.W.3d 187 (Mo. 2019) (reversing circuit court's denial of defendant's motion for summary judgment on official immunity). In so doing, the Court thoroughly explained the official immunity doctrine and its purpose to "protect[] a public official from liability if that official acts within the course of his official duties and without malice." *Id.* at 190. The Court advised that "[c]ourts applying the doctrine of official immunity must be cautious not to construe it 'too narrowly lest they frustrate the need for relieving public servants of the treat of burdensome litigation.'" *Id.* (quoting *Kanagawa v. State ex rel. Freeman,* 685 S.W.2d 831, 836 (Mo. Banc 1985)) ("[S]ociety's compelling interest in vigorous and effective administration of public affairs requires that the law protect those individuals who, in the face of imperfect information and limited resources, must daily exercise their best judgment in conducting the public's business."). In applying these principles, the Court found that because the teacher was performing a discretionary duty and there was no allegation that he acted with malice towards the student, he was entitled to official immunity on student's negligence claim. *Id.* at 193. In *Golden,* the Eighth Circuit rejected the plaintiffs' arguments that certain evidence of the principal's anger after the incident supported a finding that the principal had malice in injuring his student. 324 F.3d at 654 (explaining the evidence "cannot bear the weight [plaintiff] seeks to assign to it").

Plaintiffs do not provide any cases to support their contention that Wooten acted with malice or bad faith. Plaintiffs reiterate their § 1983 argument that based on Ms. Lato's statement and Wooten's alleged "flipping" or "throwing" a special needs child into the air after his third attempt to kick Wooten, a jury could reasonably infer Wooten acted with malice. For the same reasons stated above regarding the § 1983 claim, there are not disputed facts from which a juror could reasonably find Wooten acted with malice. As Defendants point out, the Eighth Circuit has declined to find any inference of malice where there is no evidence that the actor disliked or had any animus toward the alleged victim. *See, e.g., Golden,* 324 F.3d at 654 (the principal did not know the student, and his "harsh comments after the incident could only be a consequence of the altercation and not evidence of a previously formed animus towards [student], and thus these comments are not evidence of malice"); *K.G. by and through Gosch,* 244 F.Supp.3d at 927 ("Any inference of 'malice' is further negated by the undisputed fact that [teacher] went through an entire series of techniques to try to de-escalate the situation before ever resorting to an attempt to move KG physically…"); *see also Stephens v. Dunn*, 453 S.W.3d 241, 251 (Mo. Ct. App. 2014) (finding official immunity barred wrongful death claim because plaintiff's conclusory allegations were insufficient to state facts from which it could be inferred that defendants acted in bad faith or from improper or wrongful motive). Similar to the situation in the *K.G.* case, Wooten's use of MANDT techniques to step back or to the side to avoid Taylor's prior kick attempts negates an inference of malice. Ms. Lato's testimony regarding Wooten's concern for Taylor after he saw Taylor was injured further supports that Wooten had no animus towards Taylor. There is no evidence of "actual intent to cause injury" to support an inference of malice. Nor is there evidence to support a finding of conscious wrongdoing or an ulterior motive to support bad faith.

Wooten has established he is entitled to official immunity because Taylor's injuries arose from a discretionary act, and Plaintiffs have not demonstrated any bad faith or malicious intent on the part of Wooten to overcome his defense. Thus, Wooten is entitled to summary judgment on Count III on the basis of official immunity.

Because Wooten is entitled to official immunity on Count III, the Court need not address the merits of the parties' remaining arguments on this claim. *See B.A.G. ex rel. Greer v. Morris*, No. 4:12CV01617 AGF, 2014 WL 4267481, at *3 (E.D. Mo. Aug. 28, 2014) ("Having determined that the doctrine of official immunity protects Morris from liability, it is unnecessary to decide whether the Coverdell Act also applies."); *KC v. Mayo*, No. 18-3045-CV-S-BP, 2018 WL 2107201, at *8 (W.D. Mo. May 7, 2018) ("The Court concludes that Defendants are entitled to official immunity under state law, making it unnecessary to consider the Coverdell Act."). Nevertheless, the Court will briefly address absolute immunity.

### 2.  Absolute Immunity

Wooten also alleges he is immune from Count III under the *Paul D. Coverdell Teacher Protection Act of 2001*, 20 U.S.C. §§ 6731-6738 (2006) ("the Act"). The purpose of the Act "is to provide teachers, principals, and other school professionals the tools they need to undertake reasonable actions to maintain order, discipline, and an appropriate educational environment." 20 U.S.C. § 6732. The Act states, in relevant part, that "no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if -

> (1) The teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;
> (2) The actions of the teacher were carried out in conformity with Federal, State and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;
> (3) If appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice

> involved in the state in which the harm occurred, where the activities were
> or practice was undertaken within the teacher's responsibility;
> (4) The harm was not caused by willful or criminal misconduct, gross
> negligence, reckless misconduct, or a conscious, flagrant indifference to the
> rights or safety of the individual harmed by the teacher; and
> (5) the harm was not caused by the teacher operating a motor vehicle…

20 U.S.C. § 7946(a). The Act explicitly excludes protection for misconduct that constitutes a civil rights violation. § 7946(d)(1)(C).

Wooten argues that his conduct fell under § 7946(a)(2), and because Wooten's actions arose in the context of efforts to control Taylor and maintain order, he is entitled to immunity. Plaintiffs do not address Wooten's argument regarding § 7946(a)(2). Instead, Plaintiffs briefly state § 7946(a)(4) renders the Act's protections inapplicable to Wooten because he "**is accused of** conscience shocking willful, malicious, and intentional conduct in Count II and recklessness in Count III."

Plaintiffs have failed to show facts to support their conclusory allegations related to Wooten's intent. "Perhaps the methods shown by the summary judgment evidence to have been used by [Wooten] might have been less than ideal, but that is not the question before us." *Morrone v. Prestonwood Christian Academy,* 215 S.W.3d 575, 584 (Tex. App. 2007) (affirming summary judgment on affirmative defense of immunity under the Coverdell Act). Plaintiffs have not shown that Taylor's injuries were caused by Wooten's willful misconduct, reckless misconduct, or a conscious, flagrant indifference to Taylor's rights and safety. Thus, Wooten is alternatively entitled to absolute immunity on Count III.

Because the Court finds that Wooten is entitled to official immunity and absolute immunity, it is unnecessary to rule on whether there is a jury question regarding Wooten's state of mind to support recklessness. The Court will grant summary judgment in favor of Wooten on Plaintiffs' recklessness claim.

### E.  Punitive Damages

Defendants separately argue that they are entitled to summary judgment on Plaintiffs' request for punitive damages. Because Defendants are entitled to summary judgment on all three counts, they are not subject to punitive damages.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants SAB and Wooten's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part in accordance with the terms of this Memorandum and Order. (Doc. 118.) Defendants' Motion is denied with respect to whether Plaintiffs were required as a matter of law to exhaust administrative remedies under the IDEA. Defendants' Motion is granted with respect to summary judgment on Counts I and II.

**IT IS FURTHER ORDERED** that Defendant Wooten's Motion for Summary Judgment is **GRANTED**. (Doc. 120.)

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in favor of Defendants on Counts I, II, and III, and that Plaintiffs' Second Amended Complaint (Doc. 87) is **DISMISSED**, with prejudice.

_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of October, 2020.